JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
NANCY L. FINEMAN (SBN 124870)
nfineman@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

RICHARD DOYLE (SBN 88625)
NORA FRIMANN (SBN 93249)
**OFFICE OF THE CITY ATTORNEY**
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone:      (408) 535-1900
Facsimile:        (408) 998-3131
E-Mail Address:  cao.main@sanJoséca.gov

*Attorneys for Plaintiff the City of San Jose*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| **CITY OF SAN JOSE, a municipal corporation,**<br><br>Plaintiff,<br><br>vs.<br><br>**DONALD J. TRUMP, President of the United States, in his official capacity,**<br><br>**ELAINE C. DUKE in her official capacity, and**<br><br>**the UNITED STATES OF AMERICA**<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1.  **VIOLATION OF FIFTH AMENDMENT EQUAL PROTECTION**<br><br>2.  **VIOLATION OF 5 U.S.C. §§ 553 & 706(2)(D)** |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENT**

I.      INTRODUCTION ..................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................2

III.    PARTIES ..............................................................................................................2

     A. Plaintiff...........................................................................................................2

     B. Defendants......................................................................................................3

IV.     FACTUAL ALLEGATIONS ...............................................................................4

     A.      Immigrants Contribute to the Success of the United States and California Cities .................................................................................................................4

     B.      In 2012, DACA Is Implemented .................................................................5

     C.      DACA Has Provided 800,000 Young People Who Have Known No Other Country than the United States a Chance to Attend College and/or Work..7

     D.      San Jose and Silicon Valley Have Benefitted From DACA........................7

     E.      While President Trump Has Been Ant-Immigrant, He Has Been Supportive of DACA Recipients ....................................................................................8

          1.      Anti-Immigrant Statements by the President and His Administration..................................................................................8

          2.      Despite His Anti-Immigration Rhetoric, Trump Has Demonstrated His Support of DACA…………………………………………10

     F.      The Rescission of DACA...........................................................................11

     G.      San Jose Has Taken Action to Try to Help Its Immigrant Residents, But Has Limited Ability to Effectuate Change, Except With this Lawsuit......11

     H.      The Rescission of DACA Has Harmed San Jose.......................................12

V.      CLAIMS FOR RELIEF .....................................................................................14

VI.     PRAYER FOR RELIEF .....................................................................................15

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1  I.      **INTRODUCTION**

2      1.      For the last five years, young people who have lived in the United States since

3  they were children, even though they were born in another country, have had the right to live,

4  work and attend college if they met stringent requirements as set forth by the Deferred Action

5  for Childhood Arrivals ("DACA").  **Exhibit 1**.  The success of these DREAMers, as they are

6  known, has been an incredible story.  About 800,000 people who otherwise would not have had

7  the opportunity to attend college or work have now had that ability, thus enriching the lives of

8  themselves, their families, and their communities.  Under DACA, Plaintiff, the City of San Jose

9  ("San Jose") has been able to hire these DACA recipients, which has benefited the cities and

10  their residents.

11      2.      During the 2016 election campaign, rhetoric about immigration became nasty.

12  One of the candidates who made extremely outrageous and false statements about immigrants

13  was defendant Donald J. Trump as he ran for the office of President.  After he was elected and

14  sworn into office, President Trump's anti-immigrant rhetoric continued.  Both he and senior

15  members of this administration have made anti-immigrant statements.

16      3.      Yet, throughout the campaign and President Trump's presidency, he has made

17  positive and reassuring comments about DACA and the DREAMers.  On April 24, 2017 in an

18  interview with the Associated Press, for example, President Trump told undocumented

19  immigrants who were brought to the United States as children that they could rest easy.

20      AP: A lot of the dreamers have been hoping to hear something from you. I don't want

21      to give them the wrong message with this.

22      TRUMP: Here is what they can hear: **The dreamers should rest easy**. OK? I'll give

23      you that. **The dreamers should rest easy**....

24      4.      President Trump's stated opinion is shared by most Americans.  Since the United

25  States is a land of immigrants, most Americans realize the importance of immigrants to this

26  country.

27      5.      Despite President Trump's promises to DREAMers, he broke his promise.  He

28  directed his Attorney General to make an announcement on September 5, 2017, that DACA

would be rescinded, **Exhibit 2** and then Defendant Elaine C. Duke ("Secretary Duke") as the Acting Secretary of the Department of Homeland Security, issued a memorandum that rescinded DACA, although it deferred rescission for six months.  **Exhibit 3**.  Secretary Duke's memorandum, contrary to law, was issued without providing notice of the change and an opportunity to be heard.  The reasons for the issuance were contrary to the facts, and arbitrary and capricious.

6.      As a result of Defendants' actions, the lives of the DACA recipients, over a quarter of whom live in California, have been sent into upheaval.  Fear and uncertainty have invaded their lives.  Not only have they been injured, but so too has San Jose.

## II.      JURISDICTION AND VENUE

7.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*

8.      Venue properly lies within the Northern District of California because Plaintiff, the City of San Jose, is a public entity in this judicial district and a substantial part of the events or omissions giving rise to this action will occur or have occurred in this District. 28 U.S.C. § 1391(e).

## III.      PARTIES

### A.      Plaintiff

9.      Plaintiff San Jose is a municipal corporation, organized as a Charter City under the California Constitution and the laws of the State of California and is located in the County of Santa Clara.  It is the tenth largest city in the United States.  San Jose has always been a place for immigrants with almost 40% of its current population having been born in another country.  San Jose, which had been home to the Ohlone Indians for hundreds of years, was founded by Spain on November 29, 1777, as El Pueblo de San Jose de Guadalupe.  In 1821, San Jose became part of Mexico.  After the Treaty of Guadalupe Hidalgo ceded California to the United States at the end of the Mexican-American War in 1848, San Jose became its first incorporated U.S. city.

10.     San Jose is bringing this action on its own behalf and on the behalf of its employees who are DACA recipients.  As described below, San Jose has suffered its own injury in fact.  It also has third party standing to bring this action on behalf of its employees because San Jose has a concrete interest in the outcome of the dispute; San Jose has a close relationship with its employees, whose rights it is asserting, and there is a hindrance to the employees to protect their own interests.  *Powers v. Ohio*, 499 U.S. 400, 410-11, (1991); *Singleton v. Wulff*, 428 U.S. 106, 113-16 (1976); *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994).  Where here, San Jose is asserting the same right, to allow DACA recipient employees to have the right to legally work for San Jose, San Jose's and its employees rights are inextricably bound up, which satisfies the requirement that San Jose's interest is sufficiently aligned with that of its employees.  *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488-89 (9th Cir. 1996).  The fact that the employees are undocumented immigrants with fear of provoking the attention of the immigration authorities or creating other legal risks satisfies the requirement that there is a hindrance to San Jose's employees protecting their own interests, especially in light of Defendants' demonstrated hostility to them.  *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1044 (11th Cir. 2008).

### B.     Defendants

11.     Defendant **Donald J. Trump** has been since January 20, 2017, the President of the United States.  He is sued in his official capacity.  As a candidate, he railed against immigrants.  When he announced his candidacy in June 2015, for example, he stated: "The U.S. has become a dumping ground for everybody else's problems.  Thank you.  It's true, and these are the best and the finest.  When Mexico sends its people, they're not sending their best.  They're not sending you.  They're not sending you. They're sending people that have lots of problems, and they're bringing those problems to us.  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people."  There was no factual support for this statement.  Despite his animus towards immigrants, he has consistently indicated his support for DACA, including tweeting on September 7, 2017, after DACA was rescinded, that

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                                3

"For all those (DACA) that are concerned about status during the 6 month period, you have nothing to worry about – No action!"

12.   Defendant **Elaine C. Duke** is the acting Secretary of the Department of Homeland Security, a cabinet department of the United States government with the primary mission of securing borders of the United States.  Acting Secretary Duke issued the memorandum rescinding DACA, and she and the Department of Homeland Security are responsible for implementing the rescission of DACA.

13.   Defendant United States of America is sued under 28 U.S.C. § 1346.

## IV.   FACTUAL ALLEGATIONS

14.   The Statue of Liberty has stood as a welcoming beacon of hope and inspiration to the millions of immigrants who have come to the United States through New York.  Inscribed on the statue are the stirring words of Emma Lazarus to: "Give me your tired, your poor, your huddled masses yearning to breathe free."

15.   The reality has been far different than the Statue of Liberty's inscription as some groups in the United States have, throughout the nation's history, tried to limit citizenship to groups of people some found undesirable:  Irish, Italians, Jews, Chinese, Mexicans and the list goes on.  Yet, most of the immigrants who have come to the United States simply want to make a better life for themselves and their families and to fit in to their new country.  Our country would not be the greatest country in the world without the diversity of its citizenship achieved through immigration.

### A.   Immigrants Contribute to the Success of the United States and California Cities

16.   Studies demonstrate the positive impact immigrants, even undocumented immigrants, have on the United States.  In April of 2016, the U.S. Chamber of Commerce published a report entitled Immigration Myths and Faces, www.uschamber.com/reports/immigration-myths.  The report demonstrates that most common negative contentions regarding immigrants are false.  For example, with citation to evidence, the Chamber of Commerce demonstrates that immigrants do not take away jobs from U.S. citizens,

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

do not drive down the wages of the U.S. workers, but to the contrary, immigrants are necessary for the U.S. economy.  The Chamber also demonstrates that immigrants, even undocumented immigrants, pay taxes.  Undocumented immigrants are not eligible for federal public benefit programs like Social Security, Medicaid, Medicare, and food stamps.  The Chamber report demonstrates that undocumented immigrants do not commit more crime than citizens.  FBI data demonstrates that as the number of undocumented immigrants tripled from 1990, violent crime declined 48% and property crime declined 41%.  A report from the conservative Americas Majority Foundation found that crime rates are lowest in states with the highest immigration growth rates.  Immigrants are less likely than people born in the United States to commit crimes or be incarcerated.

17.     San Jose has been an extremely diverse region since the mid-1800s, which has led to immigrants gravitating to such areas where there are already established immigrant communities.  Waves of immigrants, from China and Mexico, Vietnam, India, and Northern Europe, have played a fundamental role in the creation of three profoundly different industries: first mining, then agriculture, and finally technology in San Jose and the Silicon Valley. http://www.sanjoseca.gov/DocumentCenter/View/19862.

### B.     In 2012, DACA Is Implemented

18.     Throughout the later part of the last century and the first part of this century, politicians could not agree on a comprehensive immigration policy.  Immigrants who would have had a clear path to citizenship in the past found citizenship almost impossible to achieve.  Yet, immigrants who had no hope in their country of birth came to the United States without documentation for a better life.  In the process, they have enriched our country.  Many of these immigrants brought their entire families, including their young children.

19.     By 2012, there were millions of residents who came here as children, but they did not have documentation to remain in this country.  As Congress stalled in enacting any meaningful immigration reform, there was a groundswell to protect these young people from deportation and allow them to live productive lives to enrich themselves, their families and their adopted country.

20.     In June of 2012, President Barack Obama, through an Executive Order, enacted DACA.  He stated that he believed it was "the right thing to do" to protect young people who do not know any country but America.  On June 15, 2012, then Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program.  **Exhibit 1**.  DACA is in essence a deferred prosecution agreement.

21.     The 2012 DACA Memorandum established that an applicant would be considered for an exercise of prosecutorial discretion only by satisfying each of the following criteria:

- came to the United States under the age of sixteen;
- had continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;
- was currently in school, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- had not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- was not above the age of thirty.

22.     In addition to simply being eligible for this program, undocumented immigrants must also pay a $495 application fee, submit several forms, and produce documents showing they meet the requirements.  Moreover, if a DACA qualifying immigrant wants to travel abroad there is an additional fee and application requirement required.  Those applying are also vetted for any criminal history or threat to national security and must be students or have completed school or military service.  If approved, action to deport them is deferred for two years, along with the opportunity to renew, along with gaining eligibility for basics like a driving license, college enrollment or a work permit.

23.     In exchange for DACA applicants providing sensitive and private information regarding their entire lives, the United States government promised to keep the information confidential and not to use it, except in limited circumstances, for any purposes except for DACA purposes.

**C.      DACA Has Provided 800,000 Young People Who Have Known No Other Country than the United States a Chance to Attend College and/or Work**

24.     The rewards of DACA have been enormous, not only to the immigrants who came to this country as children, but to the nation.  First-generation immigrants who enter the United States as children tend to pay, on average, more in taxes over their lifetimes than they receive in benefits, regardless of their education level.  DACA recipients end up contributing more than the average, because they are not eligible for any federal means-tested welfare: cash assistance, food stamps, Medicaid, health-care tax credits or anything else.

25.     Moreover, DACA recipients also are better educated than the average immigrant. Applicants must have at least a high school degree to enter the program.  An additional 36 percent of DACA recipients who are older than 25 have a bachelor's degree, and an additional 32 percent are pursuing a bachelor's degree.

26.     Further, while studies show that undocumented immigrants are much less likely to end up in prison, this fact is especially true for DACA recipients since applicants must also pass a background check, indicating even lower levels of criminal behavior than the average American citizen.

27.     DACA has been a success as it has allowed over 800,000 recipients to work and go to college in the United States thus enriching our economy and security.

**D.      San Jose and Silicon Valley Have Benefitted From DACA**

28.     For San Jose, the ability to hire DACA recipients has been extremely beneficial. San Jose, like the rest of the Silicon Valley, has the need for a skilled work force. Unemployment in Santa Clara County is low and competition for employees is fierce.  When DACA was enacted, San Jose was able to hire DACA grantees.  San Jose spent time and resources training these employees and they hold jobs vital to the operation of San Jose.

29.     San Jose is also home to tech companies, like Cisco and Adobe, who need skilled workers.  These companies also hired DACA recipients as did other Silicon Valley companies, like Apple, Facebook, and Google, and many employees live in San Jose.

**E.     While President Trump Has Been Ant-Immigrant, He Has Been Supportive of DACA Recipients**

**1.     Anti-Immigrant Statements by the President and His Administration**

30.     Donald Trump during his campaign for President and since becoming President has demonstrated an animus to immigrants.  His administration, especially people in the Department of Justice and Department of Homeland Security, has been just as anti-immigrant as the President.  Their statements demonstrate this discrimination.

31.     Candidate Trump's statements against immigrants were bombastic and incorrect. For example, Trump repeatedly denigrated Mexican immigrants in particular, even comparing them to rapists in his presidential bid announcement "When Mexico send its people, they're not sending their best. They're not sending you.  They're not sending you.  They're sending people that have lots of problems and they're bringing those problems with us.  They're bringing drugs. They're bringing crime.  They're rapists.  And some, I assume are good people." (https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.f6c79452d595)

32.     During the first Republican presidential debate, candidate Trump doubled down on his disparaging thoughts about Mexican immigrants, claiming that "The Mexican government is much smarter, much sharper, much more cunning.  And they send the bad ones over because they don't want to pay for them.  They don't want to take care of them." (https://www.nbcnews.com/news/latino/trump-claims-debate-mexico-sends-bad-ones-u-s-n405661)

33.     During another presidential debate in October 2016, candidate Trump once again broadly assaulted immigrant families and communities with his views on immigration by declaring "We have some bad hombres here and we're going to get them out."

(https:www.cnce.com/2016/10/19/trump-we-have-some-bad-hombres-and-were-going-to-get-them-out.html)

34.    After becoming President, President Trump's statements have not become Presidential, but continue to be bombastic and incorrect.  For example, President Trump again negatively referred to Mexicans as 'hombres' in a phone call with Mexico's President, condemning these immigrants by saying "You have some pretty tough hombres in Mexico that you may need help with, and we are willing to help you with that big-league.  But they have to be knocked out and you have not done a good job of knocking them out." (http://www.cnn.com/2017/08/09/politics/best-lines-trump-mexico-australia-call/index.html)

35.    President Trump and his administration further clarified their stance on immigration, as Immigration and Customs Enforcement Acting Director Thomas Homan testified that "every immigrant in this country without papers should be uncomfortable.  You should look over your shoulder.  And you need to be worried."  These sentiments were once again repeated in an interview later that week, when Homan stated that "Trump and his administration have made clear that any undocumented immigrant could be arrested and face deportation proceedings at any time, unless they have current and valid protection under DACA."  (http://www.cnn.com/2017/06/16/politics/ice-immigrants-should-be-afraid-homan/index.html)

36.    United States Attorney General Jeff Sessions further reiterated these sentiments coming from the Trump administration as he responded to immigration on Fox News in April 2017 by stating "Everybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported – well, they are.  The policy is that if people are here unlawfully, they're subject to being deported.  Our priority is clear… we can't promise people who are here unlawfully that they're not going to be deported." (http://www.foxnews.com/polticis/2017/04/19/sessions-defends-immigration-policies-after-reported-dreamer-deportation.html).

1

2

### 2. Despite His Anti-Immigration Rhetoric, Trump Has Demonstrated His Support of DACA

3

4

37.     Even as he has railed at immigrants, President Trump has repeatedly stated his

5

support for DACA recipients.  For example, in an interview with *TIME* magazine on the

6

campaign trail in December 2016, President Trump signaled that he could find a way to

7

accommodate the DREAMers "We're going to work something out that's going to make people

8

happy and proud.  They got brought here at a very young age, they've worked here, they've

9

gone to school here.  Some were good students.  Some have wonderful jobs.  And they're in

10

never-never land because they don't know what's going to happen." (http://time.com/time-

person-of-the-year-2016-donald-trump/?iid=buttonrecirc)

11

38.     President Trump made statements in an interview with Fox & Friends on January

12

18, 2017, promising "It's a plan that's going to be very firm, but it's going to have a lot of heart.

13

And we're going to be looking into that situation…. That's a very tough situation, but I think

14

they're going to end up being very happy." (http://wwwpolitico.com/story/2017/01/trump-

15

immigration-plan-233748)

16

39.     President Trump reiterated this position the next week in an interview with David

17

Muir of ABC News, claiming that "[DACA grantees] shouldn't be very worried.  I do have a big

18

heart.  We're going to take care of everybody." (http://abcnews.go.com/Politics/transcript-abc-

19

news-anchor-david-muir-interviews-president/story?id=45047602)

20

40.     At a press conference in February of 2017, President Trump announced "We're

21

going to show great heart… you have some absolutely incredible kids – I would say mostly.

22

They were brought here in such a way.  It's a very – it's a very very tough subject.  We are

23

going to deal with DACA with heart.  I have to deal with a lot of politicians, don't forget.  And I

24

have to convince them that what I'm saying is, is right… But the DACA situation is a very very

25

– it's a very difficult thing for me because you know, I love these kids.  I love kids.  I have kids

26

and grandkids and I find it very, very hard doing what the law says exactly to do."

27

(https://www.whitehouse.gov/the-press-office/2017/02/16/remarks-president-trump-press-

28

conference)

41.     In an *Associated Press* interview in April of 2017, President Trump said his administration is "not after the dreamers, we are after the criminals" and that "The dreamers should rest easy" since his Administration's policy is not to deport DACA grantees. (https://apnews.com/79f2c79805f14c3f8ac878c5df21cdfd/Trump-tells-'dreamers'-to-rest-easy,%20targets-criminaks)

42.     Even in a written statement issued shortly after the Attorney General, Jeff Sessions, announced the policy to terminate DACA, President Trump declared "I do not favor punishing children, most of whom are now adults, for the actions of their parents.  But we must also recognize that we are [a] nation of opportunity because we are a nation of laws." (http://deadline.com/2017/09/donald-trump-daca-statement-punishing-children-1202161542/)

43.     In addition to his written statement after Secretary Sessions' announcement terminating DACA, President Trump also tweeted that he "will revisit this issue!" if DACA was not legalized by Congress in the allotted 6 month time span. (https://twitter.com/real Donald Trump)

F.     **The Rescission of DACA**

44.     On September 5, 2017, President Trump, through Attorney General Sessions announced the rescission of DACA.  **Exhibit 2**.  On the same day, Elaine Duke, the Acting Secretary of the Department of Homeland Security, issued a memorandum rescinding DACA. **Exhibit 3**.  The memo was issued without compliance with the Administrative Procedures Act. There was no notification that there was going to be a change in DACA, no notice to be heard, and no factual findings or analysis to demonstrate that DACA should be rescinded.

G.     **San Jose Has Taken Action to Try to Help Its Immigrant Residents, But Has Limited Ability to Effectuate Change, Except With this Lawsuit**

45.     When Donald Trump was elected President, residents of San Jose were concerned about the President-elect's immigration positions.  In response, in January of 2017, the City Council, approved a plan proposed by Mayor Sam Liccardo to educate immigrants about their rights, helping schools with "safety plans," and allowing churches to provide

sanctuary to undocumented residents if needed.  The plan also created "safe spaces" in city-owned facilities, such as libraries, to provide pro-bono legal services.

46.      In response to the Defendants' rescission of DACA, San Jose confirmed its support of its immigrant residents and DACA recipients specifically.  Mayor Sam Liccardo, for example, issued the following statement:

> The Attorney Generals announcement of the Trump Administration's rescission of DACA abandons 800,000 of America's hardest-working, most patriotic residents. Punting the issue to Congress, without any affirmative leadership to enact a legislative solution, amounts to a cowardly cop-out, placing the futures of these young women and men in serious jeopardy.

> To San Jose's tens of thousands of DREAMers, we reiterate: "We've got your back." I will seek to challenge the Administration's actions in court, after consulting with our Council and City Attorney regarding our options in the week ahead.

History will not forgive Donald Trump for abandoning our DREAMers.

47.      Santa Clara County Board of Supervisor's Chair Dave Cortese stated:  "Trump's plan to eliminate DACA is by far his most callous attempt as of yet. The lives, dreams, and futures of thousands of DACA recipients are not a bargaining chip for this Administration to play with. I remain committed to them and to their cause.  I urge every DREAMer out there to remain resilient and hopeful.  Because together, we will rise."

48.      The Silicon Valley Organization, stated through its Executive Vice President: "Not only is the rollback of DACA immoral, but it is also terrible for America's competitive economic advantage.  Our economic strength is our diversity; it is our greatest asset and our key difference maker.  To put 800,000 Americans, whose sole 'infraction' was arriving here as children, on a path to lose citizenship will upend a large portion of this key strength.  Rescinding DACA sends the message that America's door to opportunity is slammed tighter, and that is not the message that Silicon Valley business leaders want our government to send to the world at a time when expanding opportunity is the key to long-term innovative success."

## H.      The Rescission of DACA Has Harmed San Jose

49.      The rescission of DACA has already had and will continue to have an impact, not only on the lives of the DACA recipients, but on San Jose who has suffered a concrete and

1  specific injury by the rescission.  Based upon the rescission of DACA, San Jose has had to take

2  steps to deal with the fact that starting on March 5, 2018, the date that the DACA rescission goes

3  into effect, it will lose employees, who are DACA recipients.  In order for an employer to hire

4  an employee, the employer must confirm that the employee has the legal right to work in the

5  United States.  See 8 C.F.R. § 274A.1 *et seq*.  Cities who employ people without the right to

6  work face steep penalties and criminal penalties.  However, it is also illegal for the cities to

7  terminate employees because of their nationality or immigration status.  Thus San Jose is facing

8  the uncertainty of not knowing whether they will be able to continue to retain these valuable

9  employees in their work force.  With the rescission of DACA, the DACA recipients will be

10  losing their right to work for San Jose.  In order for San Jose to end the employment relationship

11  with an employee and to make sure that there is a smooth transition without the loss of city

12  services, San Jose must start planning now.  Accordingly, even though the DACA rescission

13  allows DACA recipients to work until March 5, 2018, San Jose has not been able to wait until

14  then to make plans to have this change in work force. It has expended and will continue to

15  extend time and resources to react to this loss of experienced employees.

16       50.     The acts of Defendants have decreased the efficiency of the work performed by

17  San Jose.  The impact of the DACA rescission on DACA recipients has been catastrophic as

18  they face a future of uncertainty and fear.  San Jose has had to expend time and resources to deal

19  with the loss of productivity and employee morale because of the rescission of DACA, which is

20  another injury.  *FPL Food, LLC v. United States Dep't of Agric.*, 671 F. Supp. 2d 1339, 1358

21  (S.D. Ga. 2009).

22       51.     Additionally, because of the taxes that DACA recipients pay, San Jose is facing

23  the loss of tax revenues.  It has had to start expending time and resources to deal with this loss of

24  funds.

25

26

27  ///

28  ///

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**    13

## V.      CLAIMS FOR RELIEF

### (All Claims Are Against All Defendants)

### FIRST CLAIM FOR RELIEF

### (Violation of Fifth Amendment - Equal Protection)

52.      San Jose repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

53.      The Due Process Clause of the Fifth Amendment of the United States Constitution prohibits the federal government from denying equal protection of the laws.

54.      As set forth above, Defendants' actions target individuals for discriminatory treatment based on their national origin, without lawful justification.  Defendants' actions were motivated, at least in part, by a discriminatory intent to harm a particular group and treat them differently under the law.

55.      Defendants' discriminatory actions cannot be sufficiently justified by federal interests.

56.      Through their actions as set forth above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

57.      Defendants' actions has caused and continues to cause ongoing harm to San Jose including their DACA employees, as hereinbefore described.

58.      The City of San Jose seeks a declaration that the rescission of DACA is unconstitutional and a temporary, preliminary, and permanent injunction enjoining the rescission of DACA and enjoining the deportation of any DACA recipient.

WHEREFORE, San Jose prays for relief as hereinafter set forth.

### SECOND CLAIM FOR RELIEF

### (Violation of 5 U.S.C. §§ 553 & 706(2)(D))

59.      San Jose repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

60.     DACCA is a federal rule and therefore, before rescinding DACA, Defendants were required to comply with the Administrative Procedure Act, which requires that federal agencies go through a process of notice and comment before repealing any substantive rule. 5 U.S.C. § 553.

61.     By rescinding DACA without providing proper notice and an opportunity to comment, Defendants have violated 5 U.S.C. § 706(2)(D) because the rescission was done without proper observance of the procedure of law.

62.     Even if Defendants believed that DACA itself was defective for not complying with the Administrative Procedure Act, which it was not, Defendants were required to comply with the Administrative Procedure Act.  *Consumer Energy Council v. Fed. Energy Regulatory Com.*, 673 F.2d 425, 447 and n. 79 (D.C. Cir. 1982); *Hou Ching Chow v. Attorney General*, 362 F. Supp. 1288 (D.D.C. 1973).

63.     Accordingly, San Jose seeks a declaration that Defendants' actions violate 5 U.S.C. § 553 and § 706 and finding that the rescission of DACA is contrary to law.  San Jose also seeks a temporary preliminary and permanent injunction enjoining the rescission of DACA and enjoining the deportation of any DACA recipient.

WHEREFORE, San Jose prays for relief as hereinafter set forth

## VI.     **PRAYER FOR RELIEF**

Wherefore, San Jose prays for the following relief:

1.     A declaration that Defendants' action are unconstitutional and/or violate 5 U.S.C. §§ 553 and 706 and finding that the rescission of DACA is contrary to law;

2.     Enjoin Defendants from rescinding the DACA program and enjoin Defendants from taking any steps to deport any DACA recipients

///

///

1    3.    The costs of bringing this suit, including reasonable attorneys' fees; and

2    4.    All other relief to which San Jose may be entitled at law or in equity.

3    Dated:  September 14, 2017            **COTCHETT, PITRE & McCARTHY, LLP**

4

5                                         By:    /s/ *Joseph W. Cotchett*

6                                         JOSEPH W. COTCHETT

7                                         **OFFICE OF THE CITY ATTORNEY**

8

9                                         By:    /s/ *Richard Doyle*

10                                        RICHARD DOYLE

11                                        *Attorneys for Plaintiff City of San Jose*

12

13                            **ATTESTATION OF FILING**

14        I, Nancy L. Fineman, hereby attest, pursuant to Northern District of California, Local

15   Rule 5-1(i)(3) that concurrence to the filing of this document has been obtained from each

16   signatory hereto.

17                                         /s/ *Nancy L. Fineman*
18                                         **NANCY L. FINEMAN**
19                                         *Attorney for Plaintiff City of San Jose*

20

21

22

23

24

25

26

27

28

# Exhibit 1



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:    Janet Napolitano
Secretary of Homeland Security

SUBJECT:    Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.  It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law.  I have done so here.

Janet Napolitano

# Exhibit 2



**Office of the Attorney General**
**Washington, D. C. 20530**

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

# Exhibit 3

 Official website of the Department of Homeland Security

 U.S. Department of Homeland Security

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke
Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (#_ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied

the other requirements for a preliminary injunction.[3] (# ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (# ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (# ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] (# ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (# ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same

reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (#_ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) *Id.*

[5] (#_ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017