JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:   (650) 697-0577

NORA FRIMANN (SBN 93249)
nora.frimann@sanjoseca.gov
**OFFICE OF THE CITY ATTORNEY**
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone:      (408) 535-1900
Facsimile:       (408) 998-3131

*Attorneys for Plaintiffs the City of San Jose*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CITY OF SAN JOSE, a municipal corporation, and all those similarly situated,**<br><br>                          Plaintiffs,<br><br>      **vs.**<br><br>**DONALD J. TRUMP, President of the United States, in his official capacity,**<br><br>**CHAD F. WOLF, in his official capacity as Purported Secretary of the Department of Homeland ,**<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY,**<br><br>**U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** | Case No. 3:17-cv-05329-WHA<br><br>**AMENDED COMPLAINT FOR:**<br><br>1.  **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706**<br><br>2.  **VIOLATION OF FEDERAL VACANCIES REFORM ACT, 5 U.S.C. § 3345 *ET SEQ.*, AND HOMELAND SECURITY ACT, 6 U.S.C. §§ 112–13**<br><br>3.  **VIOLATION OF THE APPOINTMENTS CLAUSE, U.S. CONST., ART. II, § 2, CL. 2** |

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;**
**Case No. 3:17-cv-05329-WHA**

1

2   **and JOSEPH EDLOW, in his official
capacity as Purported Deputy Director
of Policy of USCIS.**

3                    Defendants.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;
Case No. 3:17-cv-05329-WHA**

1

**TABLE OF CONTENTS**

Page No.

I.  INTRODUCTION.................................................................................1

II.  JURISDICTION AND VENUE ...........................................................3

III.  PARTIES ..............................................................................................4

    A.  Plaintiff ....................................................................................4

    B.  Defendants ...............................................................................5

IV.  FACTUAL ALLEGATIONS ................................................................5

    A.  The DACA Program .................................................................6

    B.  Immigrants Contribute to the Success of the United States
       and California Cities .................................................................7

    C.  DACA Has Provided 800,000 Young People Who Have Known
       No Other Country than the United States a Chance to Attend College
       and/or Work ..............................................................................8

    D.  San Jose and Silicon Valley Have Benefitted From DACA....................9

    E.  The Latest Attempts to Diminish the DACA Program..........................10

    F.  Defendant Wolf is acting unlawfully as Acting Secretary of
       Homeland Security.................................................................11

    G.  San Jose Has Taken Action to Try to Help Its Immigrant Residents,
       But Has Limited Ability to Effectuate Change, Except With this Lawsuit ..........12

    H.  The Federal Government's Changes to the DACA Program Will Harm
       San Jose...................................................................................13

V.  CLAIMS FOR RELIEF ......................................................................15

VI.  PRAYER FOR RELIEF......................................................................19

I.    **INTRODUCTION**

1.    For the last five years, young people who have lived in the United States since they were children, even though they were born in another country, have had the right to live, work and attend college if they met stringent requirements as set forth by the Deferred Action for Childhood Arrivals ("DACA").  **Exhibit 1**.  The success of these DREAMers, as they are known, has been an incredible story.  Young people who otherwise would not have had the opportunity to attend college or work have now had that ability, thus enriching the lives of themselves, their families, and their communities.  Under DACA, Plaintiff, the City of San Jose ("San Jose"), and other California cities have been able to hire DREAMers, which has benefited the cities and their residents.

2.    DACA has protected from deportation, and extended work authorization to more than 800,000 young people who were brought to this country as children.  DACA affords recipients a two-year period of "deferred action" status, meaning they are not subject to immigration enforcement actions during that time, and work authorization, allowing them to work legally, report income, and pay taxes.

3.    During the 2016 election campaign, rhetoric about immigration became nasty.  One of the candidates who made extremely outrageous and false statements about immigrants was defendant Donald J. Trump.  After he was elected and sworn into office, President Trump's anti-immigrant rhetoric continued.

4.    Yet, throughout the early days of the campaign and President Trump's presidency, he made positive and reassuring comments about DACA and the DREAMers.  On April 24, 2017 in an interview with the Associated Press, for example, President Trump told undocumented immigrants who were brought to the United States as children that they could "rest easy."

> AP: A lot of the dreamers have been hoping to hear something from you. I don't want to give them the wrong message with this.
>
> TRUMP: Here is what they can hear: **The dreamers should rest easy**. OK? I'll give you that. **The dreamers should rest easy**....

5.      Since the United States is a land of immigrants, most Americans realize the importance of immigrants to this country.

6.      President Trump broke his promises.  He directed his Attorney General to make an announcement on September 5, 2017, that DACA would be rescinded, **Exhibit 2,** and then Defendant Elaine C. Duke ("Secretary Duke") as the Acting Secretary of the Department of Homeland Security, issued a memorandum that rescinded DACA, although it deferred rescission for six months.  ("Duke Memorandum").  **Exhibit 3**.

7.      Secretary Duke's memorandum, did not explain the administration's reasons for rescinding DACA.  Instead, the memorandum referred to the Attorney General's assertion that DACA may be unlawful, based on a case involving *different* programs – Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").  The reasons for the rescission were contrary to the facts, and arbitrary and capricious.

8.      This Court entered a preliminary injunction in January 2018, requiring DHS to continue processing renewal applications, a decision affirmed by the U.S. Court of Appeals for the Ninth Circuit in November 2018.  Then, on June 18, 2020 the Supreme Court held that the Duke Memorandum rescinding DACA was unlawful, arbitrary, and capricious under the Administrative Procedure Act, and must be set aside.

9.      In spite of the Supreme Court's decision, Defendants have continued their attempts to dismantle the DACA program.  On July 28, 2020, Defendant Chad Wolf, in his capacity as purported Acting Secretary of Homeland Security, issued a memorandum (the "Wolf Memorandum"), **Exhibit 4**, directing DHS to make immediate changes to DACA.  The Wolf Memorandum orders DHS to *reject* all new DACA applications, to *reject* all requests for advance parole (i.e., permission to re-enter the United States after traveling abroad) other than in exceptional circumstance.  The Wolf Memorandum also *reduces* the renewal period for current DACA recipients from two years to one.  On August 21, 2020, Defendant Edlow, in his purported capacity as Deputy Director of Policy of Defendant United States Citizenship and Immigration Services ("USCIS"), issued a memorandum implementing the Wolf Memorandum (the "Edlow Directive").

10.     Defendants' actions are invalid, unlawful and must be set aside.

11.     As an initial matter, Defendant Wolf lacked the authority to direct changes to the DACA program because at the time he issued the Wolf Memorandum, he was unlawfully exercising the functions of the Secretary of Homeland Security, in violation of the United States Constitution, the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3341 et seq., and the Homeland Security Act of 2002, 6 U.S.C. § 111 et seq. ("HSA").

12.     Moreover, the Wolf Memorandum, the Duke Memorandum, and the Edlow Directive were all arbitrary and capricious under the APA, and violate the Due Process Clause of the Fifth Amendment.  For these reasons, Plaintiff asks this Court to declare the Wolf Memorandum and Edlow Directive unlawful and unenforceable, and to enjoin and restrain Defendants from taking further steps to rescind the program pursuant to those unlawful actions.

13.     Over a quarter of DACA recipients live in California.  The program has benefited DACA recipients, their families, their employers, local communities, and American society as a whole.

14.     As a result of Defendants' actions, DACA recipients and these stakeholders have been harmed.  Fear and uncertainty have invaded their lives.  Not only have they been injured, but so too has San Jose.

## II.      <u>JURISDICTION AND VENUE</u>

15.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*  This Court also has additional remedial authority under the APA, 5 U.S.C. §§ 701–06.

16.     Venue properly lies within the Northern District of California because Plaintiff, the City of San Jose, is a public entity in this judicial district and a substantial part of the events or omissions giving rise to this action will occur or have occurred in this District. 28 U.S.C. § 1391(e).

17.     There exists an actual and justiciable controversy between Plaintiff and Defendants requiring resolution by this Court.  Plaintiff has no adequate remedy at law.

/ / /

III.    **PARTIES**

    A.    **Plaintiff**

    18.    Plaintiff San Jose is a municipal corporation, organized as a Charter City under the California Constitution and the laws of the State of California and is located in the County of Santa Clara.  It is the tenth largest city in the United States.  San Jose has always been a place for immigrants with almost 40% of its current population having been born in another country.  San Jose, which had been home to the Ohlone Indians for hundreds of years, was founded by Spain on November 29, 1777, as El Pueblo de San Jose de Guadalupe.  In 1821, San Jose became part of Mexico.  After the Treaty of Guadalupe Hidalgo ceded California to the United States at the end of the Mexican-American War in 1848, San Jose became its first incorporated U.S. city.

    19.    San Jose is bringing this action on its own behalf and on the behalf of its employees who are DACA recipients.  As described below, San Jose has suffered its own injury in fact.  It also has third party standing to bring this action on behalf of its employees because San Jose has a concrete interest in the outcome of the dispute; San Jose has a close relationship with its employees, whose rights it is asserting, and there is a hindrance to the employees to protect their own interests.  *Powers v. Ohio*, 499 U.S. 400, 410-11, (1991); *Singleton v. Wulff*, 428 U.S. 106, 113-16 (1976); *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994).  Where here, San Jose is asserting the same right, to allow DACA recipient employees to have the right to legally work for San Jose, San Jose's and its employees rights are inextricably bound up, which satisfies the requirement that San Jose's interest is sufficiently aligned with that of its employees.  *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488-89 (9th Cir. 1996).  The fact that the employees are undocumented immigrants with fear of provoking the attention of the immigration authorities or creating other legal risks satisfies the requirement that there is a hindrance to San Jose's employees protecting their own interests, especially in light of Defendants' demonstrated hostility to them.  *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1044 (11th Cir. 2008).

/ / /

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;
Case No. 3:17-cv-05329-WHA**    4

### B.     Defendants

20.     Defendant Donald J. Trump has been the President of the United States since January 20, 2017.  He is sued in his official capacity.  As a candidate, he railed against immigrants.  When he announced his candidacy in June 2015, for example, he stated: "The U.S. has become a dumping ground for everybody else's problems.  Thank you.  It's true, and these are the best and the finest.  When Mexico sends its people, they're not sending their best. They're not sending you.  They're not sending you. They're sending people that have lots of problems, and they're bringing those problems to us.  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people."  There was no factual support for this statement.  Despite his animus towards immigrants, he has consistently indicated his support for DACA, including tweeting on September 7, 2017, after DACA was rescinded, that "For all those (DACA) that are concerned about status during the 6 month period, you have nothing to worry about – No action!"

21.     Defendant Chad F. Wolf is the purported Acting Secretary of Homeland Security. He is purportedly responsible for managing and overseeing DHS, including the United States Citizenship and Immigration Services ("USCIS") and the Immigration and Customs Enforcement ("ICE").  Plaintiff sues him in his official capacity.

22.      Defendant DHS is a federal agency within the meaning of 5 U.S.C. § 552(f)(1), and Defendant USCIS is a component of DHS responsible for implementing the immigration laws and policies of the United States, including the DACA program.

23.     Defendant Joseph Edlow is the purported Deputy Director of Policy of USCIS. He is sued in his official capacity, in which capacity he issued the challenged Edlow Directive.

## IV.     FACTUAL ALLEGATIONS

22.     The Statue of Liberty has stood as a welcoming beacon of hope and inspiration to the millions of immigrants who have come to the United States through New York.  Inscribed on the statue are the stirring words of Emma Lazarus to: "Give me your tired, your poor, your huddled masses yearning to breathe free."

/ / /

23.     Contrasting this inspiring message, some groups in the United States have historically tried to limit citizenship to groups of people some found undesirable. Yet, most of the immigrants who have come to the United States simply want to better their lives, support their families, and contribute productively to their new country. Diversity of citizenship achieved through immigration has helped America become the international powerhouse it is today.

**A.     The DACA Program**

24.     Throughout the latter part of the last century and the first part of this century, politicians could not agree on a comprehensive immigration policy.  Immigrants who would have had a clear path to citizenship in the past found citizenship almost impossible to achieve. Yet, immigrants who had no hope in their country of birth came to the United States without documentation for a better life.  In the process, they have enriched our country.  Many of these immigrants brought their entire families, including their young children.

25.     By 2012, there were millions of residents who came here as children, but they did not have documentation to remain in this country.  As Congress stalled in enacting any meaningful immigration reform, there was a groundswell to protect these young people from deportation and allow them to live productive lives to enrich themselves, their families and their adopted country.

26.     In June of 2012, President Barack Obama, through an Executive Order, enacted DACA.  He stated that he believed it was "the right thing to do" to protect young people who do not know any country but America.  On June 15, 2012, then Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program.  **Exhibit 1**.  DACA is in essence a deferred prosecution agreement.

27.     The 2012 DACA Memorandum established that an applicant would be considered for an exercise of prosecutorial discretion only by satisfying each of the following criteria:

• came to the United States under the age of sixteen;

• had continuously resided in the United States for at least five years

preceding the date of the memorandum and is present in the United States on the date of the memorandum;

- was currently in school, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- had not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- was not above the age of thirty.

28.     In addition to simply being eligible for this program, undocumented immigrants must also pay a $495 application fee, submit several forms, and produce documents showing they meet the requirements.  Moreover, if a DACA qualifying immigrant wants to travel abroad there is an additional fee and application requirement required.  Those applying are also vetted for any criminal history or threat to national security and must be students or have completed school or military service.  If approved, action to deport them is deferred for two years, along with the opportunity to renew, along with gaining eligibility for basics like a driving license, college enrollment or a work permit.

29.     In exchange for DACA applicants providing sensitive and private information regarding their entire lives, the United States government promised to keep the information confidential and not to use it, except in limited circumstances, for any purposes except for DACA purposes.

**B.     Immigrants Contribute to the Success of the United States and California Cities**

30.     San Jose has been an extremely diverse region since the mid-1800s, which has led to immigrants gravitating to such areas where there are already established immigrant communities.  Waves of immigrants, from China and Mexico, Vietnam, India, and Northern Europe, have played a fundamental role in the creation of three profoundly different industries:

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;**
**Case No. 3:17-cv-05329-WHA**                                                                          7

1    first mining, then agriculture, and finally technology in San Jose and the Silicon Valley.

2    http://www.sanjoseca.gov/DocumentCenter/View/19862.

3         31.     Each California city has its own story of immigration from Spain, Mexico, China,

4    Russia, and other countries, which has led to California being a successful and vibrant part of

5    our country.

6         32.     And the United States has been positively impacted by immigrants, even

7    undocumented immigrants, as reflected in multiple studies.  In April of 2016 for example, the

8    U.S. Chamber of Commerce published a report entitled Immigration Myths and Faces,

9    www.uschamber.com/reports/immigration-myths.  The report demonstrates that most common

10    negative contentions regarding immigrants are false.  For example, with citation to evidence, the

11    Chamber of Commerce demonstrates that immigrants do not take away jobs from U.S. citizens,

12    do not drive down the wages of the U.S. workers, but to the contrary, immigrants are necessary

13    for the U.S. economy.  The Chamber also demonstrates that immigrants, even undocumented

14    immigrants, pay taxes.  Undocumented immigrants are not eligible for federal public benefit

15    programs like Social Security, Medicaid, Medicare, and food stamps.  The Chamber report

16    demonstrates that undocumented immigrants do not commit more crime than citizens.  FBI data

17    demonstrates that as the number of undocumented immigrants tripled from 1990, violent crime

18    declined 48% and property crime declined 41%.  A report from the conservative Americas

19    Majority Foundation found that crime rates are lowest in states with the highest immigration

20    growth rates.  Immigrants are less likely than people born in the United States to commit crimes

21    or be incarcerated.

22       **C.**      **DACA Has Provided 800,000 Young People Who Have Known No Other**

23               **Country than the United States a Chance to Attend College and/or Work**

24         33.     The rewards of DACA have been enormous, not only to the immigrants who

25    came to this country as children, but to the nation.  First-generation immigrants who enter the

26    United States as children tend to pay, on average, more in taxes over their lifetimes than they

27    receive in benefits, regardless of their education level.  DACA recipients end up contributing

28    more than the average, because they are not eligible for any federal means-tested welfare: cash

1   assistance, food stamps, Medicaid, health-care tax credits or anything else.

2       34.    Moreover, DACA recipients also are better educated than the average immigrant.

3   Applicants must have at least a high school degree to enter the program.  An additional 36

4   percent of DACA recipients who are older than 25 have a bachelor's degree, and an additional

5   32 percent are pursuing a bachelor's degree.

6       35.    Further, while studies show that undocumented immigrants are much less likely

7   to end up in prison, this fact is especially true for DACA recipients since applicants must also

8   pass a background check, indicating even lower levels of criminal behavior than the average

9   American citizen.

10       36.    DACA has been a success as it has allowed over 800,000 recipients to work and

11   go to college in the United States thus enriching our economy and security.

12       **D.**    **San Jose and Silicon Valley Have Benefitted From DACA**

13       37.    For San Jose, the ability to hire DACA recipients has been extremely beneficial.

14   San Jose, like the rest of the Silicon Valley, has the need for a skilled work force.  Competition

15   for employees in San Jose and Santa Clara County is fierce.  When DACA was enacted, San

16   Jose was able to hire DACA grantees.  San Jose spent time and resources training these

17   employees and they hold jobs vital to the operation of San Jose to this day.

18       38.    The City is one of the largest employers in the region, employing workers in a

19   wide variety of positions for the betterment of their community. One of the main ways in which

20   the City has benefited from the DACA program is through its employment relationships with

21   DACA recipients.  In particular, the City currently employs DACA recipients as full-time

22   employees, and has expended significant resources, both time and money, in training these

23   employees and relies upon them to provide City services.  Because DACA recipients are under

24   no obligation to identify themselves as such when they apply for a job, and they present the

25   same form of work authorization card as other categories of immigrants, the City cannot

26   determine with certainty the total number of DACA recipients it employs.

27       39.    San Jose is also home to tech companies, like Cisco and Adobe, who need skilled

28   workers.  These companies also hired DACA recipients as did other Silicon Valley companies,

1   like Apple, Facebook, and Google, and many employees live in San Jose.

2       40.    DACA recipients have special skills that make them especially valuable

3   employees of the City.  For example, over ninety-five percent of DACA recipients are bilingual,

4   and extraordinarily valuable skill to the City, which must employ a workforce that can meet its

5   diverse residents' language needs.  This is a critical aspect of ensuring meaningful access to City

6   services, programs, and benefits.  Given San Jose's incredible diversity, bilingual employees are

7   an enormously valuable asset and San Jose would be greatly harmed to lose it.  City employment

8   is contingent on valid, lawful work authorization.  Any restraints on the DACA program and

9   DACA recipients undoubtedly harm the City.

10          **E.    The Latest Attempts to Diminish the DACA Program**

11      41.    Less than six weeks after the Supreme Court's vacatur of the Duke

12   Memorandum, DHS issued the Wolf Memorandum, announcing it was "considering anew the

13   DACA policy."  *Id.* at 4.  The Memorandum explains that "the DACA policy, at a minimum,

14   presents serious policy concerns that may warrant its full rescission," offering several policy

15   "concerns."  *Id.*  Those concerns do not constitute a valid, reasoned basis for the changes to

16   DACA outlined in the Wolf Memorandum.

17      42.    First, the Memorandum's assertion that "rescinding DACA entirely may well

18   create a more pressing need for Congress" to enact immigration reforms—i.e., creating political

19   pressure on the legislature—is not a valid basis on which to put hundreds of thousands of DACA

20   recipients at risk.  *Id.*

21      43.    The Wolf Memorandum then expresses general concerns about general policies

22   of "non-enforcement."  *Id.* at 5.  His concerns, however, are not supported by any evidence that

23   such policies—policies that have been used by DHS for decades—negatively impact effective

24   immigration enforcement.

25      44.    Third, the Wolf Memorandum raises a concern that DACA might encourage

26   "illegal immigration," especially "illegal immigrations involving children going forward."

27   may be sending mixed signals about the agency's "intention to consistently enforce the

28   immigration laws as Congress has written them."  *Id.*  Again, however, Defendant Wolf

1  provides no empirical evidence supporting the idea that DACA has increased rates of illegal

2  immigration.

3      **F.    Defendant Wolf is acting unlawfully as Acting Secretary of Homeland**

4          **Security**

5      45.    At the time he issued the Wolf Memorandum, Defendant Wolf was unlawfully

6  serving as Acting Secretary of Homeland Security.  He was not authorized to exercise the duties

7  of the office of Secretary of Homeland Security pursuant to the United States Constitution, the

8  Homeland Security Act, and the Federal Vacancies Reform Act.  As such, he lacked authority to

9  issue to Wolf Memorandum, and the Wolf Memorandum is therefore without force or effect.

10     46.    The Appointments Clause of the U.S. Constitution states that the President "shall

11  nominate, and by and with Advice and Consent of the Senate, shall appoint . . . Officers, of the

12  United States."  U.S. Const., art. II, § 2, cl. 2.  There has been no Senate-confirmed Secretary of

13  Homeland Security since April 10, 2019, when former Secretary Kirstjen Nielsen resigned.  The

14  position was held by CBP Commissioner Kevin McAleenan (without Senate confirmation) until

15  November 13, 2019, when he resigned.  Thereafter, Defendant Wolf purported to take office as

16  Acting Secretary of Homeland Secretary.

17     47.    The Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, lays out

18  how agencies are to be governed while awaiting nomination and confirmation of agency-heads.

19  Defendants failed to follow the FVRA.

20     48.    Under the FVRA, the "first assistant to the officer" of a vacant office becomes

21  the acting official by default, 5 U.S.C. § 3345(a)(1).  However, the President may also direct a

22  person to fill a vacancy in an acting capacity *for no more than 210 days* from the date of the

23  vacancy.  5 U.S.C.  § 3345(a)(2), 3346.  After that period, "the office shall remain vacant"

24  except in certain limited circumstances not applicable here). 5 U.S.C. § 3348(b)(1).

25     49.    The Homeland Security Act ("HSA"), 6 U.S.C. § 101 *et seq.*, further details the

26  line of succession that should be followed when the Secretary of Homeland Security position is

27  vacated.  Under 6 U.S.C. § 113(a)(1)(A), the Deputy Secretary of Homeland Security is the

28  "first assistant" for purposes of the FVRA.  The Under Secretary for Management of the DHS is

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;**
**Case No. 3:17-cv-05329-WHA**                                          11

1   next in line.  *See* 6 U.S.C. § 113(g)(1).

2       50.     Defendants violated the Appointments Clause, the FVRA, and the HSA.

3       51.     In February 2019, Secretary Nielsen issued an order of succession—HSA

4   Delegation 00106, Revision No. 08.4 ("Nielsen Delegation").  Neither Commissioner

5   McAleenan, nor Defendant Wolf, fall within the proper order of succession under the Nielsen

6   Delegation.

7       52.     Commissioner McAleenan's subsequent attempts to amend the Nielsen

8   Delegation were unlawful and invalid, because he lacked authority to amend the Delegation.

9       53.     Under the Nielsen Delegation, and the HSA, the Director of Cybersecurity and

10  Infrastructure Security Agency, Christopher Krebs (who had been confirmed by the Senate),

11  should have been designated as the Acting Secretary of Homeland Security upon Commissioner

12  McAleenan's resignation.

13      54.     Finally, under the FVRA, as of November 7, 2019, the office of Secretary had

14  remained without a Senate-confirmed nominee for more than 210 days, requiring the office to

15  "remain vacant."  5 U.S.C. § 3348(b)(1).

16      55.     Defendant Wolf's actions as purported Acting Secretary of Homeland Security—

17  including issuance of the Wolf Memorandum, are without force and effect.  5 U.S.C. §

18  3348(d)(1), (2).

19      **G.     San Jose Has Taken Action to Try to Help Its Immigrant Residents, But Has**

20          **Limited Ability to Effectuate Change, Except With this Lawsuit**

21      56.     San Jose's support of immigrants has been consistent throughout the events

22  giving rise to this case. For example, in response to President Trump's widespread anti-

23  immigrant rhetoric, in January of 2017, the City Council, approved a plan proposed by Mayor

24  Sam Liccardo to educate immigrants about their rights, helping schools with "safety plans," and

25  allowing churches to provide sanctuary to undocumented residents if needed.  The plan also

26  created "safe spaces" in city-owned facilities, such as libraries, to provide pro-bono legal

27  services.

28  / / /

57.     In response to the Defendants' rescission of DACA, San Jose confirmed its

support of its immigrant residents and DACA recipients specifically.  Mayor Sam Liccardo, for

example, issued the following statement:

> The Attorney Generals announcement of the Trump Administration's rescission of DACA abandons 800,000 of America's hardest-working, most patriotic residents. Punting the issue to Congress, without any affirmative leadership to enact a legislative solution, amounts to a cowardly cop-out, placing the futures of these young women and men in serious jeopardy.
>
> To San Jose's tens of thousands of DREAMers, we reiterate: "We've got your back." I will seek to challenge the Administration's actions in court, after consulting with our Council and City Attorney regarding our options in the week ahead.

History will not forgive Donald Trump for abandoning our DREAMers.

58.     Santa Clara County Board of Supervisor's Chair Dave Cortese stated: "Trump's

plan to eliminate DACA is by far his most callous attempt as of yet. The lives, dreams, and

futures of thousands of DACA recipients are not a bargaining chip for this Administration to

play with. I remain committed to them and to their cause.  I urge every DREAMer out there to

remain resilient and hopeful.  Because together, we will rise."

**H.     The Federal Government's Changes to the DACA Program Will Harm San Jose**

59.     The Wolf Memorandum (and the Edlow Directive purportedly implementing it)

orders DHS to reject all new initial DACA applications, to reject all advance parole applications

absent exceptional circumstances, and to reduce the renewal period for current DACA recipients

from two years to one year, applying these changes retroactively to all applications submitted

after the Supreme Court's June 18, 2020 decision.

60.     These directives already have had and will continue to have an impact, not only

on the lives of the DACA recipients, but on San Jose, which has suffered a concrete and specific

injury by the changes contemplated by the Wolf and Edlow changes to the program.

61.     In order for an employer to hire an employee, the employer must confirm that the

employee has the legal right to work in the United States.  See 8 C.F.R. § 274A.1 *et seq.*  Cities

who employ people without the right to work face steep penalties and criminal penalties.

However, it is also illegal for the cities to terminate employees because of their nationality or

immigration status.  Thus San Jose is facing the uncertainty of not knowing whether it will be able to continue to retain valuable DACA employees in its work force.

62.     For example, an employee whose DACA status is up for renewal, must now contend with retroactive application of a law reducing their renewal period by *half*.  Those who are unable to renew their applications and do not have alternative methods for obtaining lawful immigration status, are subject to deportation.  This causes considerable uncertainty and instability to San Jose.

63.     It also causes San Jose harm in that the resources and time spent training and retaining current DACA recipient employees is in effect, wasted.  San Jose has expended and will continue to extend time and resources to react to such a loss of experienced employees.

64.      And in order for San Jose to end the employment relationship with an employee and to make sure that there is a smooth transition without the loss of city services, San Jose must start planning now. San Jose must make preemptive plans to change their workforce in this manner. Defendants' changes to the program will cost valuable city resources as San Jose scrambles to meet its personnel needs in light of Defendants' changes, amongst budgeting and bureaucratic constraints unique to such public entities.

65.     Moreover, prohibiting any new DACA applications divests the City of San Jose of a segment of the workforce it would otherwise be permitted to hire and retain.

66.     The acts of Defendants have decreased the efficiency of the work performed by San Jose.  The impact of Defendants' changes to DACA recipients has been catastrophic as they face a future of uncertainty and fear.  San Jose has also had to expend time and resources to deal with the loss of productivity and employee morale because of the rescission of DACA, which is another injury.[1]

67.     Additionally, because of the taxes that DACA recipients pay, San Jose is facing the loss of tax revenues.  They have had to start expending time and resources to deal with this loss of funds.

---

[1] *See e.g., FPL Food, LLC v. United States Dep't of Agric.*, 671 F. Supp. 2d 1339, 1358 (S.D. Ga. 2009).

# V.   CLAIMS FOR RELIEF

## (All Claims Are Against All Defendants)

### FIRST CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, 5 U.S.C. § 706

68.     Plaintiff re-alleges and incorporate by reference all the allegations set forth in this Amended Complaint.

69.     The Wolf Memorandum and Edlow Directive are subject to judicial review as final agency actions.

70.     The APA requires courts to "hold unlawful and set aside" agency action "found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law."  5 U.S.C. § 706(2).

71.     The Wolf Memorandum is arbitrary and capricious, an abuse of discretion, contrary to law, and in excess of statutory authority.  The Wolf Memorandum and Edlow Directive were issued by and pursuant to the directives of an Acting Secretary who had no authority to so act.

72.     Moreover, the Wolf Memorandum and Edlow Directive fail to provide a reasoned basis for the actions of DHS, and fail to consider other important aspects and issues, including the reliance interests of the City of San Jose and its employees.

73.     The Wolf Memorandum and the Edlow Directive implementing it are arbitrary and capricious, contrary to law, and in excess of statutory authority in violation of 5 U.S.C. § 706(2)(A) & (C), and must be held unlawful and set aside.

74.     San Jose, its employees, and its residents have been harmed and continue to be harmed by these unlawful acts.

/ / /

/ / /

/ / /

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;**
**Case No. 3:17-cv-05329-WHA**                                                                 15

1

2

3

**SECOND CLAIM FOR RELIEF**

**Violation of Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*,**

**and Homeland Security Act, 6 U.S.C. §§ 112–13**

4      75.     Plaintiff re-alleges and incorporates by reference all the allegations set forth in

5    this Amended Complaint.

6      76.     The Secretary of Homeland Security must be appointed by the President with the

7    advice and consent of the Senate.  6 U.S.C. § 112(a)(1).

8      77.     When the office of the Secretary is vacant, only a valid Acting Secretary may

9    perform the functions or duties of the Secretary.

10      78.     Commissioner McAleenan lacked the authority to amend the order of succession

11    which purported to make Defendant Wolf next in line for Acting Secretary for at least three

12    independent reasons.

13      79.     First, Commissioner McAleenan improperly assumed the position of Acting

14    Secretary in violation of the order of succession under the HSA, 6 U.S.C. § 113(g)(2), and so

15    was not lawfully serving as Acting Secretary.

16      80.     Second, section 113(g)(2) of the HSA authorizes only the Secretary, not an

17    *Acting* Secretary, to establish a further order of succession to that office.[2]

18      81.     And third, by the time Commissioner McAleenan purported to amend the DHS

19    order of succession, he had already been serving for longer than the FVRA's limit of 210 days.

20    *See* 5 U.S.C. § 3346(a).  Because the office of the Secretary had been vacant for more than 210

21    days, the FVRA required that it "remain vacant" until the President submitted a nominee to the

22    Senate.  *Id.* § 3348(b)(1).

23      82.     Thus, for these reasons, Commissioner McAleenan amended the order of

24    succession without lawful authority, and his actions "have no force or effect," 5 U.S.C.

25    § 3348(d)(1).  Because Defendant Wolf assumed the position of Acting Secretary pursuant to

26

27

28

---

[2] *See Nw. Immgr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, No. 19-cv-03283-RDM, slip op. at 38–42, 52 (D.D.C. October 8, 2020) (Moss, J.) ("The Court therefore concludes that 'Secretary' in § 113(g)(2) does not include an Acting Secretary, but instead means the Secretary and only the Secretary.").

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

Commissioner McAleenan's unlawful amendments, his service in that role is unlawful under both the HSA and FVRA.

83.     Besides these defects in Commissioner McAleenan's authority, by the time Defendant Wolf assumed the role of Acting Secretary on November 13, 2019, the office of the Secretary had been vacant for 217 days, a week past the total 210 days an office can by occupied by an acting official before it must remain vacant under the FVRA.  *See* 5 U.S.C. § 3346(a). And by the time Defendant Wolf issued the Wolf Memorandum on July 28, 2020, the office of the Secretary had been vacant for 475 days and Defendant Wolf had been serving as Acting Secretary for 258 days.  For these reasons as well, Defendant Wolf's assumption of the office and issuance of the Wolf Memorandum were unlawful.

84.     As a result of these separate and independent legal infirmities, Defendant Wolf was not lawfully serving in the office of Acting Secretary, no officer could perform the functions of Acting Secretary, and no officer had legal authority to issue a memorandum even temporarily rescinding or modifying key components of the DACA program.

85.     Because the Wolf Memorandum was issued by an officer unlawfully serving as Acting Secretary, it "shall have no force and effect" and "may not be ratified."  5 U.S.C. § 3348(d)(1), (d)(2).  Defendant Wolf's First and Second Ratification Memoranda are therefore contrary to the plain terms of the FVRA and cannot remedy the legal defects of the Wolf Memorandum.  Even if the plain text of the FVRA did not bar ratification, Defendant Wolf could not have issued his Ratification Memoranda because, as already explained, the office of the Secretary has been vacant for far more than 210 days and must "remain vacant, 5 U.S.C. § 3346(a); the FVRA prohibits nominees from serving in an acting capacity the role for which they have been nominated, *see id.* § 3345(b)(1); and, in any event, the Gaynor Order did not and could not cure the defects in Wolf's unlawful assumption of the role of Acting Secretary.

86.     Because the Wolf Memorandum was issued by an unlawfully designated officer under the HSA and the FVRA, it must be held to have "no force or effect."  5 U.S.C. § 3348(d).

87.     San Jose, its employees, and its residents have been harmed and continue to be harmed by these unlawful acts.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**THIRD CLAIM FOR RELIEF**

**Violation of the Appointments Clause, U.S. Const., art. II, § 2, cl. 2**

88.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Amended Complaint.

89.     At the time he issued the Wolf Memorandum, Defendant Wolf was unlawfully serving as Acting Secretary of Homeland Security.  He was not authorized to exercise the duties of the office of Secretary of Homeland Security pursuant to the United States Constitution, the Homeland Security Act, and the Federal Vacancies Reform Act.  As such, he lacked authority to issue to Wolf Memorandum, and the Wolf Memorandum is therefore without force or effect.

90.     Defendants violated the Appointments Clause, the FVRA, and the HSA.

91.     In February 2019, Secretary Nielsen issued an order of succession—HSA Delegation 00106, Revision No. 08.4 ("Nielsen Delegation").  Neither Commissioner McAleenan, nor Defendant Wolf, fall within the proper order of succession under the Nielsen Delegation.

92.     Commissioner McAleenan's subsequent attempts to amend the Nielsen Delegation were unlawful and invalid, because he lacked authority to amend the Delegation.

93.     Under the Nielsen Delegation, and the HSA, the Director of Cybersecurity and Infrastructure Security Agency, Christopher Krebs (who had been confirmed by the Senate), should have been designated as the Acting Secretary of Homeland Security upon Commissioner McAleenan's resignation.

94.     Finally, under the FVRA, as of November 7, 2019, the office of Secretary had remained without a Senate-confirmed nominee for more than 210 days, requiring the office to "remain vacant."  5 U.S.C. § 3348(b)(1).

95.     Defendant Wolf's actions as purported Acting Secretary of Homeland Security—including issuance of the Wolf Memorandum, are without force and effect.  5 U.S.C. § 3348(d)(1), (2).

96.     Defendant Wolf was not serving legally as the Acting Secretary of Homeland Security, and therefore did not have legal authority to issue the Wolf Memorandum or to appoint

1  Defendant Edlow to serve as Deputy Director for Policy of USCIS.

2      97.    The Wolf Memorandum and Edlow Directive are invalid and must be vacated,

3  because they were issued by officials without the authority to do so.

4      98.    San Jose, its employees, and its residents have been harmed and continue to be

5  harmed by these unlawful acts.

6  **VI.    PRAYER FOR RELIEF**

7  WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

8      A.    Vacate and set aside the Wolf Memorandum, Edlow Directive, and any other

9  action taken by Defendants in furtherance of the full or partial rescission of the DACA program;

10     B.    Declare that the Wolf Memorandum and Edlow Directive and Defendants'

11 actions in connection therewith were issued in violation of the Homeland Security Act and the

12 Federal Vacancies Reform Act and are void and without legal force or effect;

13     C.    Declare that the Wolf Memorandum and Edlow Directive were issued were

14 issued in violation of the Appointments Clause of the U.S. Constitution;

15     D.    Declare that the Wolf Memorandum, and Edlow Directive and Defendants'

16 actions in connection therewith are arbitrary, capricious, an abuse of discretion, otherwise not in

17 accordance with law, and without observance of procedure required by law in violation of 5

18 U.S.C. §§ 702–06;

19     E.    Enjoin and restrain Defendants from implementing or enforcing the Wolf

20 Memorandum, Edlow Directive, and from fully or partially rescinding DACA and from taking

21 any other action that is not in compliance with applicable law;

22     F.    Further relief as necessary to remedy the injuries caused by the unlawful actions

23 taken by Defendants;

24     G.    Award reasonable attorneys' fees and costs; and

25

26 / / /

27 / / /

28 / / /

1        H.      Award Plaintiff such further and additional relief as the Court deems just and

2   proper.

3

4   Dated:  November 2, 2020                    **COTCHETT, PITRE & McCARTHY, LLP**

5                                                By:    /s/ *Justin T. Berger*
                                                        JOSEPH W. COTCHETT
6                                                       JUSTIN T. BERGER
                                                        BRIAN DANITZ
7                                                       TAMARAH P. PREVOST

8                                                **OFFICE OF THE CITY ATTORNEY**

9                                                By:    /s/ *Nora Frimann*
                                                        NORA FRIMANN
10
                                                 *Attorneys for Plaintiff City of San Jose*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;**
**Case No. 3:17-cv-05329-WHA**                                              20

1

## <u>ATTESTATION OF FILING</u>

2

I, Justin T. Berger, hereby attest, pursuant to Northern District of California, Local Rule

3   5-1(i)(3) that concurrence to the filing of this document has been obtained from each signatory

4   hereto.

5

*/s/ Justin T. Berger*
_____

6

**JUSTIN T. BERGER**
*Attorney for Plaintiffs City of San Jose*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF;**
**Case No. 3:17-cv-05329-WHA**